BLUE RIDGE INTERURBAN RAILWAY COMPANY v. HENDERSONVILLE LIGHT AND POWER COMPANY ET AL.

(Filed 22 September, 1915.)

**Water and Water Courses—Water Powers—Interurban Railways—Easements —Condemnation—Interpretation of Statutes.**

> Chapter 74, Laws 1907, amended by chapter 302, Laws 1907, authorizes street and interurban railway companies, under certain conditions, to acquire by condemnation, in the manner provided for railway companies, water rights or other easements which are necessary to fully develop their water power on unnavigable streams flowing by their lands, etc., which is further amended by chapter 94, Laws 1913, with proviso that this right shall not extend to any water power, right or property of any person, firm or corporation engaged in the actual service of the general public, where such power, right or property is being used or held to be used or developed for use, or in connection with or in addition to any power actually used by such person, firm or corporation serving the general public. *Held,* a public-service corporation, chartered by name of interurban railway, owning lands on one bank of an unnavigable stream, cannot condemn across the stream and take the water rights held in the stream by another such and adjoining public-service corporation, when it appears that the defendant holds its lands across the stream for the further use of supplying power to operate its electric light and power plant, with which it is supplying such light and power to its patrons; and where there is evidence tending to show the existence of such facts, the question is a mixed one of fact and law for the determination of the jury; and the refusal of the trial judge to submit appropriate issues thereon is reversible error. *R. R. v. Oates,* 164 N. C., 172, cited and approved.

BROWN, HOKE, ALLEN, and WALKER, JJ., concurring in the result.

Appeal by defendant from *Webb, J.,* at November Term, 1914, of Henderson.

*Smith & Shipman, Tillett & Guthrie for plaintiff.*
*Staton & Rector, Charles F. Toms, J. W. Keerans, Michael Schenck, for defendants.*

Clark, C. J. This is a proceeding by the plaintiff to condemn the one-half interest of the defendants in the water power in question. It is admitted that the line between the two runs to the middle of the stream, the plaintiff owning one-half of the bed of the stream on the south side and the defendants owning the half of the bed of the stream on the north side, for half a mile.

It was suggested for the plaintiff in the outset of the argument that this was not a water power. If so, certainly the plaintiff has no right to condemn it, for it is not seeking to take the bed of the stream, nor the water as a right of way. Besides the complaint alleges that plaintiff needs it for the water power.

Neither can we give any weight to the suggestion that the interest of the defendants in this water power is too evanescent and intangible for it to object to the plaintiff taking it away, for the plaintiff admits that it offered $1,000 for the defendants' interest and that it refused an offer from the defendants of $40,000 for its own interest in the power. Indeed, the jury say the value of defendants' share in the water power is $10,000, and the plaintiff is seeking to force the defendants to take that sum for its interest.

This is too serious a matter and too important to be minimized. In view of the not distant exhaustion of the coal measures of the country, these sources of heat, and already almost the sole source of artificial lighting, are a matter of the gravest concern to Government and people.

The effort of this plaintiff to take water power from these defendants was settled in the litigation between these same parties, *R. R. v. Oates,* 164 N. C., 169, and this is practically an attempt to reverse that decision in an action over this property. It may be observed that if the plaintiff could take the defendants' interest in this proceeding there is no conceivable reason why the defendants are not equally entitled to take the plaintiff's interest.

The defendant light and power company was chartered in 1904 to supply light and power to the people of Hendersonville and surrounding country. It puts in evidence that it bought and holds this power for development and use as a necessary auxiliary to its other two powers, having purchased this power for that purpose. Its tract on the north side at this place, called "The Narrows," on Green River, extends for half a mile, with a fall of 218 feet, through which the water pours with

great velocity, capable of furnishing water power of perhaps 2,700 h. p., though the witnesses naturally vary in their estimates. The plaintiff company was organized in South Carolina and as a manufacturing company, but finding it could not condemn water power in North Carolina unless it was a corporation of this State and, under the act of 1907, an interurban railroad also, it later took out incorporation here as an "interurban railway."

The public policy of a State is defined by its legislature. Probably the most feared combination to be guarded against is the acquisition of the water powers of the country by one or more great aggregations of capital, which in view of the certainty of the exhaustion of our coal measures at no distant date will give such monopolies the full control of· light, heating and power, and with them domination over the very means of existence of the public. With that view, the General Assembly of this State, in conferring the power of condemnation on telephone and electric light and power companies by ch. 74, Laws 1907, inserted a *proviso:* "Water powers, developed or undeveloped, with the necessary land adjacent thereto for their development, shall not be taken." To meet this provision, the influences behind these great aggregations of capital were powerful enough, it seems, to procure later at that session the enactment of ch. 302, Laws 1907, which authorizes street and interurban railway companies, "whenever such company shall not own the entire water front, or all the lands, water rights, or other easements which may be needed to fully develop such water power," to buy same; with further provision that if the company could not agree with the owner for the purchase of such lands, water rights and other easements, the same might be condemned in the manner provided for railroads. The adroit purpose of this alternative probably passed unperceived.

When this same point was presented between these same parties, *R. R. v. Oates,* 164 N. C., at p. 169, the Court said: "It would therefore seem that if a company needed a water power to produce electric power, and styled itself an electric and power company, it could not condemn the water power of another for that purpose. Ch. 74, Laws 1907. But if it styled itself 'a street and interurban railway company,' and should 'own land on one or both sides of the stream which can be used in developing water power,' it might have condemned the additional lands 'needed to fully develop such water power,' ch. 302, Laws 1907. In *Power Company v. Whitney,* 150 N. C., 34, it was held that water powers could not be condemned in this State, it being against our public policy as declared by ch. 74, Laws 1907. While matters were in this state, the Legislature enacted ch. 94, Laws 1913, which was entitled 'An act to amend chapter 302, Laws 1907, relating to the right of eminent domain.' The amendment consisted in the addition to the said chapter 302, sec. 1, Laws 1907, of the following words: *'Provided*

*further,* that such company or companies shall not have the power to condemn any water power, right or property of any person, firm or corporation engaged in the actual service of the general public, where such power, right or property is being used or held to be used or to be developed for use, or in connection with, or in addition to any power actually used by such persons, firms or corporations serving the general public.' "

It appearing in that case, as it does in this, that this particular property was held to be used and developed in connection with and in addition to the power actually used by the defendant light and power company in supplying electric lights and power to Hendersonville and surrounding country, this Court held that judgment should have been entered for the defendants.

In this new proceeding the plaintiff seeks to evade that decision by setting up the plea that the defendants cannot use or develop one-half interest in said water power, and therefore the plaintiff is entitled to condemn the same and take the whole of it for its own use. If this were true, the defendants would have equal right to condemn the plaintiff's half interest in the property for their own use, the more especially as the plaintiff offered the defendants only $1,000 for their half interest and the defendants offered the plaintiff $40,000 for its half interest, which the plaintiff admits that it declined.

In *R. R. v. Oates,* 164 N. C., at p. 172, the Court said, as to condemning water power, "The matter turns, therefore, on the question whether under the terms of ch. 94, Laws 1913, the land in question is subject to condemnation," and the Court further held that it could not be condemned if it was "held to be used or to be developed for use in connection with or in addition to any power actually used."

On this trial the court submitted the following two issues to the jury:

(1) Are the water powers, rights and properties on the land of the respondents, as described in the petition, capable of being developed for the production of electric power for use in connection with and in addition to the electric power already developed and in use by the respondent Hendersonville Light and Power Company?

(2) Are the water powers, rights or properties on the land of the respondents, as described in the petition, being held by the respondent, Hendersonville Light and Power Company, to be used and to be developed for use in connection with or in addition to any power now actually used by the said respondent, Hendersonville Light and Power Company?

There was much and conflicting evidence on these propositions, and the defendants were certainly entitled to have these issues submitted to the jury. The defendants could not be deprived of their property without due process of law and according to the law of the land. They had the right to have these issues of fact found by a jury, and upon such findings the court should have imposed judgment of law, subject to

review on appeal. The court, however, withdrew this right from these defendants and directed the jury to answer both issues against them.

The defendants offered full evidence that the water could be divided by a dam extending halfway across the stream, then up the middle of the stream. It is a self-evident proposition, not requiring evidence, that such a dam would ordinarily allow more water to go down the plaintiff's side, as that would be without an obstruction, while on the defendants' side the water might be ponded back. But in a stream like this, falling 218 feet in half a mile, such a dam would accurately divide the water, provided the stream is the same depth all the way across, and if not, a mathematical calculation would regulate the location of the dam to make an even division.

This is not a navigable stream, and the defendants, owning to the bed of the stream, could build a dam all the way up on their line. To do so would throw no water on the plaintiff's side and take none from it. Neither would there be this effect if the defendants built their wing dam on their line only part of the way. Above the commencement of the wing dam and below its end the water would be unaffected. For the space of the wing dam the cross dam to its lower end would pond the water on the defendants' side, but would in no wise affect its height either by raising or lowering it on the plaintiff's side. The defendants do not propose to take one drop of water out of the stream, but merely to take out of it that intangible, invisible, imperceptible power known as the force of gravity which by turbine wheels or otherwise will generate the electricity which will run their street cars, electric lights and heating in the town of Hendersonville, and will enable them to execute their contracts.

This division of the water of a stream by wing dams without in any wise lowering or raising the water in the plaintiff's half of the stream is a matter of common knowledge. In the evidence in this case the witness Seaver tells of two such developments near Waynesville in this State. The witness Sherrer also tells of a similar development in Caldwell County. Both of these witnesses were experienced engineers and found by the court to be experts.

In the "Official Electrical Directory of the United States" there are named many "wing-dam developments" of water power in one-half of the stream, among them the famous Keokuk plant on the Mississippi at Keokuk, Iowa, developing in this manner 200,000 h. p. Another is at McCall's Ferry on the Susquehanna River, which furnished all the power for Baltimore, Md. At Minneapolis, Minn., is the similar well known development of power on either side of the river for Minneapolis and St. Paul. Another is at St. Croix, Wisconsin, where half the power is on the Minnesota side and the other half on the Wisconsin side. Likewise, there is a similar development at International Falls, Minne-

sota, where the Canada half is operated on the Ontario side and the other half in Minnesota. The most striking instance, however, is the development of water power on both banks of the Niagara River.

The defendants offered evidence that their offer of $40,000 for the plaintiff's half was *bona fide* and that they wished to use the entire 2,700 h. p. if the plaintiff would sell, and if it would not, that the 1,350 h. p. on their own side is an absolute necessity to enable them to carry out the contracts already made, for which their other plants were insufficient unless they had the aid of their half interest in this power.

In *Power Co. v. Navigation Co.*, 152 N. C., 472, the objection was made by the lower proprietor against the upper proprietor on the same side, that the water was diverted out of the stream by a canal which carried the water behind the lower proprietor's mill and emptied into the river several miles below, thus, as the lower proprietor claimed, reducing the quantity of water which could have been utilized for running his own mill lower down on the same side with the defendant's intake.

Here the plaintiff and defendants are opposite owners and the defendants are only seeking to place a dam on their line in the middle of the stream curving back to the bank by which they will not take any water out of the stream, but will take the half which comes down their side of the dividing line, conduct it by a flume to the turbines which will take out the intangible force that by means of the turbine will generate electricity, thus leaving the water on the plaintiff's side of the stream at no time higher or lower than it would be without the dam on the dividing line. The plaintiff contends that this can not be done. The defendants offered evidence that it could be, giving the opinion of expert engineers who testified as to many places in which this is being done. The matter should have been submitted to the jury as an issue of fact.

The defendants, as riparian owners on one side of the stream, had the right to make a reasonable use of the water on their side, either for domestic or manufacturing purposes, and whether their proposed use would be unreasonable was a question for the jury to determine under all the facts and circumstances. If the jury should find, upon the evidence, that the defendants' half of the water power could be used as they propose, to generate electricity without building entirely across the stream, then this water power was specifically exempt from condemnation by ch. 94, Laws 1913. It was so held in the litigation between these same parties in *R. R. v. Oates,* 164 N. C., 170.

The question whether the use made by the riparian owner of the water of a stream upon its own riparian land is a reasonable use is one of fact and not of law. *Prentiss v. Geiger,* 74 N. Y., 341; *Bullard v. Mfg. Co.,* 77 N. Y., 525; Gould on Waters, sec. 220; *Dumont v. Kellog,*

18 Am. Rep. (Mich.), 102); *Hayes v. Waldron,* 84 Am. Dec. (N. H.), 105; *Merryfield v. Worcester,* 14 Am. Rep. (Mass.), 592; *Ulbritch v. Water Co.,* 4 L. R. A. (Ala.), 474. A riparian owner may temporarily retain water by dams in order to furnish power to run machinery, when the amount is reasonable (*Pierson v. Spyer,* 12 Am. St. (N. Y.), 499), and there are very numerous other cases with which the books are filled.

The defendants asked the court to charge: "If the stream, Green River, in its entirety within the land described in the petition, and the land adjoining said stream on the opposite side thereof, constituted a water power, then one-half of said stream, being an integral part of said water-power right or property, would not be subject to condemnation, and you will answer the second issue 'Yes.'" Under chapter 94, Laws 1913, and the decision in *R. R. v. Oates,* 164 N. C., 167, it was error not to give this instruction. In any aspect it was error for the court to take the issue from the jury and to answer it himself.

The defendants further requested the court to charge: "The entire stream, Green River, along the water front of the respondents' land is a water power, and if the one-half of said stream owned by the defendants is condemned for the use of the plaintiff, then the value of said one-half should be taken into consideration in estimating the amount of damages to which the defendants are entitled, as well as all the other facts and circumstances tending to show the value of the proposed water-power development of the plaintiff, of which development the lands of the respondents form an integral and necessary part, according to the contentions of the plaintiff."

If the plaintiff had been legally entitled to condemn the water-power of the defendants at all, this prayer should have been given. The court, however, refused to so charge, and instructed in lieu thereof, that "the defendants would only entitled to the present value of their 76 acres of land, lessened by reason of the diversion of the water which the plaintiff seeks to take," saying, in effect, in his charge, that the defendants were not entitled to the value of the water-power which was to be taken from them by the "strong arm," but they were only entitled to the diminution in the value of their land by the plaintiff's taking one-half of the water from the stream.

The result of this charge is practically shown by the fact that though the defendants had offered the plaintiff $40,000 for its half interest in the water-power, and the plaintiff admitted on the stand that it had declined that offer, and would not take it, the jury assessed the value of the defendants' damages by reason of its half being taken from them by the plaintiff at $10,000—a patent loss of at least $30,000, and, according to their evidence, very much more damage than this was inflicted upon these defendants, who would be prevented from filling their contracts.

The defendants also requested the court to charge: "If the jury should find from the evidence that the stream, Green River, in its entirety between the land described in the petition and the land of the petitioner on the opposite side of the stream contains a water-power capable of development, and that such development when made has a market value, then it would be the duty of the jury, in estimating the compensation to be awarded the defendants for the condemnation for their lands, to consider the value of such development to which such water-power may be adaptable; and if the jury should find that the respondents owned one-half of the water-power capable of development, then it would be the duty of the jury to award as compensation to the defendants for the taking of their land or water rights one-half the value of such water-power capable of such development."

This proposition is so clear that no argument should be required. The defendants were certainly entitled to the value of the property which was taken from them, and under certain circumstances they were entitled to more than the above measure, because if, as their testimony shows, this water-power was necessary to enable them to execute the contracts which they had taken, or proposed to take, in furnishing light and power, the loss of this power might inflict a much greater loss upon them by reason of the disability thus inflicted upon them, for it may well be that there is no other water-power of ready access which they can acquire for their purposes at the same price.

The right of the defendants to the use of the water along their frontage, provided only they returned the water to the stream in undiminished quantity before it reaches the next lower proprietor, is fully recognized in the very full discussion by *Walker, J.,* in *Power Co. v. Navigation Co.,* 152 N. C., 472, and that is all the defendants propose. They will not divert the water itself out of the stream beyond their lower line. They will merely transmit the power generated by the weight of falling water over cables to their other plants, but the water itself will pass on in undiminished volume. If not, it will be for the lower proprietor to complain. The plaintiff, the opposite proprietor, cannot object so long as the defendants do not use in generating power more than half the water. This is not a navigable stream.

The defendant, the Hendersonville Light and Power Company, is engaged in serving the general public, and holds its half interest in this property for development in connection with its other plants. In the former case between these parties, 164 N. C., 167, this Court told this plaintiff that it could not take water power from the defendants except with their consent, by purchase. It can make no difference that the defendants own only one-half of the power instead of the whole. The plaintiff could not condemn one-half of a graveyard or half a dwelling-house, because it or some one else owned the other half, and, for a

stronger reason, because it is against public policy, the plaintiff cannot take the defendants' half of this water-power, especially when the plaintiff has refused to sell its own half to the defendants at four times the price for which it seeks to make the defendants yield their half.

Upon the face of the complaint the plaintiff is endeavoring to take the property of the defendants and devote it for their own benefit to the very same purpose for which the defendants are holding it, *i. e.,* for the development of a water-power for public use.   This cannot be done. 2 Lewis Em. Dom. (3 Ed.), 400.

In refusing to submit the issues to the jury there was

Error.

BROWN, J., concurring in result:  All the evidence in this record is to the effect that the property sought to be condemned by plaintiff is a water-power owned jointly by plaintiff and defendant as opposite riparian owners.   I do not think the water can be legally divided except by mutual consent of both owners, as that would be to greatly diminish the value of the power as a whole.

In this respect I think the law is correctly stated in the concurring opinion of *Mr. Justice Allen.*   It may be that in the case of very large, powerful and navigable streams, such as the Mississippi, the Niagara, and others, and under the authority of special local statutes, such division and diversion of the water may be both practicable and legal. But no such conditions exist here.

I concur in the judgment of the Court submitting a proper issue to the jury to determine the fact as to whether the defendant is using or holding this water-power to be used or developed for use in connection with or addition to any power actually used by it.

An examination of the authorities convinces me that the opposite riparian owner cannot be permitted to build a dam to the middle of the stream and divert the water through a flume, to the injury of the opposite riparian owner.   If the water can be utilized in no other way, then it is not such water-power that, under the statute, is not subject to condemnation.

HOKE, J., concurring:  Our statute, in permitting water-powers to be condemned for public use, withdraws from the effect of the law any water-power which is being used or held to be used or to be developed for use in connection with or in addition to any power actually being used for public service," etc.

There is evidence in the record tending to show that defendant is the riparian owner of land on one side of Green River, where there is a considerable fall in the stream, giving promise of a good water-power, if properly developed.   The officials of the company testify, further, that

defendants purchased and now hold this property with a view to aid their power already developed, and now being used under a charter for the benefit of the public; that they have great need of such undeveloped power and propose to utilize the same as contemplated and provided by the statute.

Whether they can carry out their purpose and utilize this power in substantial aid of the power already developed, and without unwarranted interference with the rights of plaintiffs, who own along the opposite bank, is, in my opinion, a mixed question of law and fact, and, on the record, requires that the issue be submitted to the jury.

ALLEN, J., concurring in result: The water right or property of the defendant, as riparian owner, is subject to condemnation, unless it is "being used or held to be used or to be developed for use in connection with or addition to any power actually used by" the defendant, within the meaning of the proviso to chapter 302, Laws of 1907, as amended by chapter 94, Laws of 1913 (being section 2575 of Gregory's Supplement), and I doubt if there is any evidence of this fact, but as the other members of the Court are of a contrary opinion, and no legal principle is involved in this question, I concur in the judgment ordering a new trial.

I do not think the defendant has any property in the water in the stream, and that it is only entitled to a reasonable use of it *as it passes his land,* which may include the use for manufacturing purposes.

The defendant has no right, in my opinion, to build a dam to the middle of the stream and divert half the water through a flume, although he may return it into the stream one-half mile below, before it leaves his land, and if this is the only way the water can be utilized, it is not a water right or property which cannot be condemned under the statute.

The common law determines, with us, the rights of riparian owners in a stream of water flowing through their lands, and the controlling principles are, I think, correctly stated in Angell on Water Courses, sec. 100, as follows:

"Whenever a water course *divides two estates,* the riparian owner of neither can lawfully carry off any part of the water without the consent of the other opposite; and each riparian owner is entitled, not to half, or other proportion of the water, but to the whole bulk of the stream, undivided and indivisible, or *per my et per tout.* To use the language of *Platt, J.,* in *Vandenburg v. Vanbergen,* in New York, . . . 'The grant of an *undivided share* in a stream would not authorize the grantee to appropriate or modify the stream to the injury of others who have a joint interest in it. The property in a stream of water is *indivisible.* The joint proprietors must use it as an entire stream in its natural channel; a severance would destroy the rights of all. In

*Blanchard v. Baker,* in Maine, the defendants, who had their dam on the side of the stream opposite to the plaintiff's dam, contended that they had a good and legal right to one-half of the water in the main stream, and to carry it off by deepening an ancient outlet or canal. . . . . It was held that the defendants had not a right to one-half of the water in the main stream of the river, so as to abstract it by means of the channel in question. The Court said, in reply to the suggestion, that the owners of the dam on the eastern side of the river had a right to half the water, and *to divert to that extent:* 'It has been seen, that if they had been the owners on both sides, they had no right to divert the water, without again returning it to its original channel. Besides, it was impossible, in the nature of things, that they could take it from their side only; an equal portion from the plaintiff's side must have been mingled with all that was diverted."

The following authorities support the text: *Pugh v. Wheeler,* 19 N. C., 50; *Durham v. Cotton Mills,* 141 N. C., 624; *Harris v. Railway Co.,* 153 N. C., 544; *Webb v. Portland Mfg. Co.,* 3 Sumner, 200; *Plumleigh v. Dawson,* 6 Ill., 550; *Parker v. Griswold,* 17 Conn., 300; *Carpenter v. Gold,* 88 Va., 553; *Vandenburg v. Vandenburg,* 13 Johns, 217; *Blanchard v. Baker,* 8 Me., 266; *Davis v. Getchell,* 79 A. D., 636; *Newhall v. Ireson,* 54 A. D., 790; Farnham on Waters, vol. 2, sec. 464, *et seq.;* Gold on Waters, sec. 204, *et seq.*

The language in the statute, "held to be used or to be developed," means more than a mere mental operation, and at least conveys the idea of capacity for use or development.

I do not attach any importance to the proposition of the defendant to pay the plaintiff $40,000 for its water right on the opposite side of the stream, conceding it to have been made in good faith, because it has no bearing on the legal questions involved and on the record is much like offering to buy the middle link in a chain without purchasing the chain.

Walker, J., concurs in the opinion of Allen, J.