BLUE RIDGE INTERURBAN RAILWAY COMPANY v. HENDERSONVILLE
LIGHT AND POWER COMPANY ET ALS.

(Filed 22 March, 1916.)

**1. Water and Water-courses—Condemnation—Statutes—Exceptions—Burden
of Proof.**

Water powers are subject to condemnation under our statutes, chapter
302, Laws 1907, amended by chapter 94, Laws 1913, unless the same are
"used or held to be used or to be developed for use in connection with
or addition to any power actually used by such persons, firms, or corpora-
tions serving the general public"; and where a *quasi*-public corporation
brings action for condemnation, and the defendant resists upon the
ground that the lands or power sought to be taken are protected by the
statute, the burden of proof is upon the defendant to bring the lands or
water power within the provision of the statutes excepting them.

**2. Same—Trials—Evidence—Questions of Law—Verdict, Directing.**

Where a *quasi*-public corporation, with the power of condemnation,
seeks to condemn a stream of water for water power, which is jointly
owned by an opposite riparian owner, and the respondent resists the
proceedings upon the sole ground that it is to be used in connection with
and in addition to its electric power already developed and in use by it,
the burden is upon the respondent to bring itself within the exception
of the statute; and where its evidence tends solely to show that it
could only do so by the use of a wing dam, this would infringe the
plaintiff's right to the use of the whole bulk of the stream, undivided
and indivisible, presenting insufficient evidence of his contention to be
presented to the jury, and the plaintiff's right will be established as a
matter of law.

ALLEN, J., concurring.
CLARK, C. J., and HOKE, J., dissenting.

PETITION to rehear. Upon the trial *Webb, J.,* submitted these issues
to the jury and instructed the jury to answer issues *a* and *b* "No."

*a.* Are there water powers, rights, and properties on the lands of
the respondents as described in the petition capable of being devel-
oped for the production of electric power for use in connection with
and in addition to the electric power already developed and in use by
the respondent, Hendersonville Light and Power Company? Answer:
"No."

*b.* Are there water powers, rights, or properties on the lands of
the respondents as described in the petition which are being held by the
respondent, Hendersonville Light and Power Company, to be used or
to be developed for use in connection with or in addition to any power
now actually used by the said respondent, Hendersonville Light and
Power Company? Answer: "No."

*c.* What compensation are defendants, or either of them, entitled
to recover for the acquirement by condemnation by the petitioners of

the right to divert the water in the manner set forth in the petition?
Answer: "Ten thousand dollars ($10,000)."

*Manning & Kitchin, Smith & Shipman, Tillett & Guthrie for
plaintiffs.*
*Staton & Rector, Michael Schenck, C. F. Toms, and J. W. Keerans
for defendants.*

BROWN, J. This case is reported in 169 N. C., 471. It is a con-
demnation proceeding brought by the plaintiff to condemn certain prop-
erty called a water power belonging to the defendant. The defendant
owns the land on one side of the stream and an undivided half interest in
the water power. The plaintiff owns the land on the other side of the
stream and a half interest in the water power. All water powers are as
much subject to condemnation as any other property, unless it is estab-
lished that they are "being used or held to be used or to be developed
for use in connection with or addition to any power actually used by
such persons, firms, or corporations serving the general public." If this
is not the correct principle to be applied to the facts in this record, the
statute conferring the right to condemn water rights is a dead letter, and
such rights or power cannot be condemned by the terms of the statute.
If we go further, and hold that, although not so used as specified in the
statute, the owner may divert the water and convert it into such a water
power, there is nothing left for the statute to operate upon. There are
few if any streams in North Carolina the waters of which cannot be so
diverted and developed into a water power.

The effect of this proviso in the statute (1907, ch. 302, as amended
ch. 94, Laws 1913, Gregory's Supp., sec. 2575d) is to place the burden
of proof upon the owner of the water power sought to be condemned to
introduce evidence sufficient to be submitted to a jury that will bring
the property within the exception made by the above quoted proviso.
If the owner fails, then the property is subject to condemnation. If the
owner offers sufficient competent evidence, it is the duty of the judge to
submit the proper issue to the jury. It is earnestly contended upon
the rehearing that the defendant has failed to offer any sufficient evi-
dence tending to prove that its half interest in this water power can be
developed in any practicable way consistent with well established prin-
ciples of law for use in connection with or addition to any power
actually in use by defendant. That is the only proposition presented
upon this rehearing.

In his opinion *Mr. Justice Allen* doubts if there is any evidence in
the record sufficient to go to the jury tending to bring the defendant's
half interest in the water power within the exception exempting it from
condemnation. Further examination of the case compels the majority of
the Court to the conclusion that there is no such evidence.

RAILWAY CO. *v.* POWER CO.

We now conclude that all the evidence, taken in its most favorable light for defendant, discloses that the only feasible method by which the defendant can develop this water power for use is to construct a dam to the middle of the stream and divert half the water through a flume on its own side of the river. This is the only practicable method pointed out by the evidence, and to develop it in that manner would violate a well settled principle of law.

A majority of this Court held on the former hearing that "Where a stream passes between the lands of opposite riparian owners, one of such owners cannot build a dam to the middle of the stream and divert half the water through a flume, although he may return it into the stream before it leaves his land, since in such case each riparian owner is entitled to the whole bulk of the stream, undivided and indivisible." 86 S. E., 296.

That this conclusion is sustained by the overwhelming weight of authority is demonstrated in the opinion of *Mr. Justice Allen* in this case, concurred in by *Mr. Justice Walker* and the writer. For additional supporting authority, see Waters and Water-courses, Cent. Dig., sec. 72, Dec. Dig., 80. A reëxamination of the evidence shows only one plan of development proposed by defendant. Mr. Oates, the president and general manager of defendant, testified that he had made plans and calculations to develop his side of the Narrows. He further says: "Owing to my ownership only to the middle of the stream, my plan was to take out half of the water by means of a diverting dam, and convey it on the north bank to the mouth of Pulliam's Creek, utilize it through my water wheels and turn it back into the river on my own land. I had several estimates made as to the cost of that development, and have had it surveyed and worked out by several engineers. The first was Mr. Charles E. Waddell."

The witness was asked the specific question: "Tell us your plans for the development of the Narrows, and how you expect to do it, the cost of it, what profit there will be in it." To this he responded: "It simply involves the use of a diverting dam; it is merely a projecting wall built into the stream to divert half the water of Green River into a canal or race which we will use for a certain distance to a settling basin, where we can accumulate water and acquire a static head, and then convey the water by means of a steel flume to wheels in the power-house situated at the mouth of Pulliam's Creek, and the power applied and transmitted."

Upon cross-examination he was asked as to the effect of taking half of the water, and he replied: "The other half will be left in the stream and he can get it if he wants it. I will give him permission to go over and get it. They could not do it without my permission and without going on my lands."

Witness Shearer, hydraulic engineer, testified for defendant: "I made an examination of the stream with a view of determining whether it is practicable for the owner of the north bank to divert· one-half the stream from the channel, use it for developing water power, and return to the stream on the same land. As an engineering proposition, approximately one-half the volume of the water of the stream can be diverted to the Torrence side and developed into a water power and returned. At or near the head of the Torrence tract I would begin a canal, ditch, or open earth flume around the side of the hill. Would extend the mouth of the ditch into the stream at this point and carry this water around on the Torrence property to a point probably 200 to 300 feet down stream, form a little basin, carry it from there by a pipe, flume, or other method to the power-house."

None of the witnesses examined proposed any plan of development except the plan set out in the testimony of Oates and Shearer.

After a critical examination of all the evidence, we are unable to find a single suggestion for developing and using the defendant's half of this water power except that which contemplates taking one-half the water out of the stream.

His Honor instructed the jury that the burden of proof was on defendant to show by the greater weight of evidence that this water power was capable of being developed for use in connection with the power now used by defendants, and further instructed the jury that upon all the evidence, if believed, to answer issues *a* and *b* "No." Applying the principles laid down in this opinion, we think the charge should be approved.

The issue as to damages was fairly submitted to the jury in a full and clear charge, of which the defendants have no right to complain. The petition to rehear is allowed, and upon such rehearing we find in the trial as had in the Superior Court

No error.

All the costs of this Court will be taxed against defendants.

ALLEN, J., concurring: I have carefully examined the record in this appeal several times, and I do not find a line in it which would warrant the charge that the plaintiff is a trust or that it is owned by the Southern Power Company or by the Dukes; but if these facts appeared, they would not justify us in denying to it the recognition of its property rights.

The only place where the word "Duke" appears is on page 22 of the record, where John A. Law, a witness for the plaintiff, said, on cross-examination: "I am a banker, cotton mill manufacturer, and a director in one railroad, the Piedmont and Northern. The same interests own controlling stock in that and the Southern Power Company. Never

heard this railroad called the Southern Power Company road; have heard it called the Duke road. I think he is president." That this refers to the Piedmont and Northern I think clearly appears from page 23 of the record, where the directors of the plaintiff company are named, among which the name of Duke does not appear, and from page 54 of the record, where W. S. Montgomery testifies that he is president of the plaintiff company.

If, however, the plaintiff is a trust, the fault is with the General Assembly of this State, which granted to it its charter and from whom it derives all of its powers. It is not claimed that these powers have been exceeded, and if this could be shown, it ought to be pointed out in order that the State may take steps to have the charter forfeited.

There is but one question in this appeal, and that is whether the defendant has offered evidence tending to prove that its water power and water right, which the plaintiff seeks to condemn, is not the subject of condemnation.

If the defendant has offered evidence tending to prove this fact, it is entitled to have it considered by a jury; but if not, it was the duty of the judge to so hold as matter of law.

The right of this plaintiff to condemn water rights and water powers is clearly recognized in an opinion by the *Chief Justice,* between the same parties, in *R. R. v. Oates and the Light and Power Co.,* 164 N. C., 172, and repeated in 169 N. C., 474, where he says: "In *R. R. v. Oates,* 164 N. C., at p. 172, the Court said, as to condemning water power: 'The matter turns, therefore, on the question whether under the terms of ch. 94, Iaws 1913, the land in question is subject to condemnation,' and the Court further held that it could not be condemned if it was 'held to be used or to be developed for the use in connection with or in addition to any power actually used.'"

This cannot mean anything except that the plaintiff can condemn the water right or water power of the defendant unless the defendant proves that the water right or water power was "held to be used or to be developed for use in connection with or in addition to any power actually used."

This is the issue between the parties, and the point of difference is whether the defendant has offered evidence that its water power was "held to be used or to be developed for use in connection with or in addition to any power actually used."

As pointed out in the opinion of *Associate Justice Brown,* where the evidence is quoted, the defendant did not claim that its water power could be so used or developed except by running a dam to the middle of the stream and by diverting one-half the stream and conducting it one-half mile through its own land before its return to the stream, and, in the opinion of the Court, this is not permissible, the Court having

adopted as the correct rule determining the right in nonnavigable water of opposite riparian owners the one laid down by Angell on Watercourses, sec. 100, as follows: "Whenever a water-course *divides two estates,* the riparian owner of neither can lawfully carry off any part without the consent of the other opposite; and each riparian owner is entitled, not to half or other portion of the water, but to the whole bulk of the stream, undivided and indivisible, or *per my et per tout.* To use the language of *Platt, J.,* in *Vandenburg v. Vanbergen,* in New York. : . . 'The grant of an *undivided share* in a stream would not authorize the grantee to appropriate or modify the stream to the injury of others who have a joint interest in it. The property in a stream of water is *indivisible.* The joint proprietors must use it as an entire stream in its natural channel; a severance would destroy the rights of all. In *Blanchard v. Baker,* in Maine, the defendants, who had their dam on the side of the stream opposite to the plaintiff's dam, contended that they had a good and legal right to one-half of the water in the main stream, and to carry it off by deepening an ancient outlet or canal. . . . It was held that the defendants had not a right to one-half of the water in the main stream of the river, so as to abstract it by means of the channel in question. The Court said, in reply to the suggestion, that the owners of the dam on the eastern side of the river had a right to half the water, and *to divert to that extent:* 'It has been seen that if they had been the owners on both sides, they had no right to divert the water without again returning it to its original channel. Besides, it was impossible, in the nature of things, that they could take it from their side only; an equal portion from the plaintiff's side must have been mingled with all that was diverted.' "

The reason for permitting the plaintiff to condemn the water power or water right of the defendant, when the defendant cannot condemn the water power or water right of the plaintiff, is that the General Assembly has conferred this power upon the plaintiff and those doing a like business, and has denied it to the defendant.

The *Chief Justice* said in *R. R. v. Oates,* 164 N. C., 169: "It would, therefore, seem that if a company needed a water power to produce electric power, and styled itself an electric light and power company, it could not condemn the water power of another for that purpose. Chapter 74, Laws of 1907. But if it styled itself 'a street and interurban railway company,' and should 'own land on one or both sides of a stream which can be used in developing water power,' it might have condemned the additional lands 'needed to fully develop such water power.' Chapter 302, Laws 1907."

The General Assembly, and not the courts, have made this distinction between the powers and rights granted to the plaintiffs and de-

fendants respectively, and as this is a question of State policy committed to the General Assembly, we must obey, not thwart, its will.

It would seem that the defendant, who is represented as a "poor man" with "one little ewe lamb" (one-half of a water power on one side of a stream), ought to be grateful that it has escaped the payment of $40,000 for another "little ewe lamb" (one-half of the stream on the opposite side) of the same size and weight and kindred, which the jury has found was only worth $10,000.

It will be remembered that Nathan was dealing in figure of speech when he was talking to David, and that David's anger was greatly kindled against the rich man, and that Nathan said to David, "Thou art the man."

CLARK, C. J., dissenting: This is a petition to rehear the decision in this case, 169 N. C., 472. The petition does not comply with Rule 53 of this Court, for it does not "assign the alleged error of law complained of or the matter overlooked." 164 N. C., 556.

The court withdrew the case from the jury by instructing them to answer issues *a* and *b* "No," instead of leaving to them to answer upon the evidence. These issues are as follows:

"*a.* Are there water powers, rights, and properties on the land of the respondents, as described in the petition, capable of being developed for the production of electric power for use in connection with and in addition to the electric power already developed and in use by the respondent, Hendersonville Light and Power Company?" and

"*b.* Are there water powers, rights, or properties on the land of the respondents, as described in the petition, which are being held by the respondent, Hendersonville Light and Power Company, to be used and to be developed for use in connection with or in addition to any power actually used by the said respondent, Hendersonville Light and Power Company?"

*Mr. Justice Hoke* stated the matter clearly in his opinion in this case at the former hearing, *R. R. v. Light and Power Co.,* 169 N. C., at p. 480, as follows: "Whether they (the defendants) can carry out their purpose and utilize this power in substantial aid of the power already developed and without unwarranted interference with the rights of the plaintiff who owns along the opposite bank, is, in my opinion, a mixed question of law and fact, and, on the record, requires that the issue be submitted to the jury."

*Brown, J.,* also said, 169 N. C. at p. 479: "I concur in the judgment of the Court submitting a proper issue to the jury to determine the fact as to whether the defendant is using or holding its water power to be used or developed for use in connection with or in addition to any power actually used by it." *Allen, J.* (with whom *Walker, J.,* con-

RAILWAY CO. *v.* POWER CO.

curred), said: "I do not think the defendant has any property in the water in the stream, and that it is only entitled to a reasonable use of it as it passes his land, which may include the use for manufacturing purposes."

This last is all that the defendant sought, and it is for its choice to say whether it shall use it by an undershot or an overshot wheel for grinding, or conduct it through a tube to a point lower down, so that in that way its fall shall utilize the force of gravity which will be converted into electricity and carried by cables to run the street cars and lights of the defendant, which is exactly the use to which plaintiff itself seeks to apply it.

The testimony of the witnesses R. M. Oates, W. H. Banks, J. W. Seaver, and D. R. Shearer was ample to go to the jury and, indeed, clear and explicit that the defendants could develop on their half of the stream 1,360 h.p., and that this could be done without materially interfering with the rights of the plaintiff on the opposite side of the stream. As we held before, this evidence should have gone to the jury, and in withdrawing it the judge assumed to himself the functions of the jury and denied to these defendants their constitutional rights.

This is a proceeding by the plaintiff to take from the defendants their one-half of the stream which is the boundary between the two. It is admitted that the line between them runs to the middle of the stream, the defendants owning one-half of the bed of the stream for half a mile on the south side and the plaintiff owning the other half. The plaintiff alleges that it has a right to condemn this water power of the defendants, notwithstanding a statute prohibiting the condemnation of any water power, because, as it alleges, the defendants cannot utilize it for that purpose, and, therefore, the plaintiff can take it against the will of the defendants. In *R. R. v. Oates,* 164 N. C., 169, and in *R. R. v. Light and Power Co.,* 169 N. C., 472, we held that upon the evidence this was an issue of fact which the defendants were entitled to have a jury pass upon. The plaintiff again insists for the third time that it can have the judge withdraw that issue from the jury and find as a matter of law that the defendants could not use their half of the stream to generate water power.

Laws 1907, ch. 74, contains this provision: "Water powers, developed or undeveloped, with the necessary land adjacent thereto for their development, shall not be taken" under condemnation proceedings. This act was sustained in *Power Co. v. Whitney,* 150 N. C., 34.

There are many reasons why the defendants cannot be deprived of their property in this case without violating the guaranty that property shall not be taken, as was said, 169 N. C. at p. 474, "without due process of law and only according to the law of the land. The defend-

RAILWAY CO. *v.* POWER CO.

ants had the right to have the issue of fact (whether they could utilize their half of the stream) found by a jury, and only upon such finding should the court have imposed the judgment of the law."

In *Dargan v. R. R.,* 113 N. C., 596, it was said that "the right of the State to take private property rests upon the ground that there is a *public* necessity for such appropriation." It is not a public necessity that the plaintiff should take from the defendants the enjoyment of their property in this water power. When a railroad track is to be laid out from one point to another, the construction of the railroad being a *quasi*-public matter, it is a public necessity that it shall lay out its line, with such restrictions as the statute requires, across the land of individuals, and, therefore, the right of eminent domain is conferred upon the railroad company with the correlative right that, being a public corporation, it can be regulated by the State; but it is not a public necessity that the railroad company shall take the defendant's water power, which is not needed for its right of way and is merely a facility for the subsequent operation of the road. It would be as accurate to say that the plaintiff could condemn a coal mine 100 miles *or more* off its line to generate power for its engine, or a forest anywhere to obtain wood for its engines or cross-ties for its track, as to say that it could condemn the defendant's falling water to generate electric power to move its engines.

It would be as just to say that one railroad could condemn the engines or the freight cars or the passenger cars of another company, because that would be a facility to operate its lines fully as much as to take from the defendants the water power, which the defendants purchased to aid in running their street cars in Hendersonville and to furnish light and power for the citizens of that town, for the convenience of the plaintiff in running its railroad.

But if it were conceded, as it cannot be, that it is a public necessity, from the nature of the property it is clear for many reasons that, while it would be a convenience, it is not a *necessity* at all.

1. The plaintiff and defendants might build a dam, or several dams, across the stream in its precipitous course and divide the water at the middle of the crest, as Goat Island divides Niagara Falls into the Canadian and American Falls. There is evidence, and it is also common knowledge, that this is practicable and has been done in many cases.

2. Or, the plaintiff and the defendant might coöperate by having all the water conducted into one power plant and equally divide between them the electricity created. It is common knowledge that this has been done in many cases, and it is entirely practicable. The great power plants in the State thus divide and distribute to different towns

and to different individuals the power generated by them. Certainly the plaintiff and defendants might divide it into two equal parts.

3. Or, the defendants might, by putting in a wing dam, use their half of the water without in any wise diminishing the capacity of the plaintiff to use the other half. There was ample evidence in this case that this could be done, and that as a matter of fact it was being done at other points in the State and all over the country. While the defendants seemed to prefer this method to the other two above named, they were not restricted to this. They are entitled to use and enjoy their half interest in this water power, because it is evident that it can be utilized by them for the purpose of running their street cars and furnishing power and light.

In *Linderman v. Lindsey,* 8 Am. Decisions, 325, *Mr. Justice Sharswood* says: "When the proprietor of the two opposite banks of a stream of water are desirous of enjoying the advantage of the water for propelling machinery, a dam for that purpose cannot be built, except by mutual consent, *unless, indeed, it may be what is termed a wing dam confined to the soil of the person who erects it, on that half of the bed of the stream which belongs to him.*" This principle is also laid down by *Shaw, C. J.,* in *Elliott v. R. R.,* 57 Am. Dec., 88, quoted by *Brown, J.,* in *Harris v. R. R.,* 153 N. C., 545.

In *Charnock v. Higuerra,* 52 Am. St., 197, it was held: "Since the right to make use of the stream is common to all who own property on its shores, there would *prima facie* seem to be no cause of complaint for any use made by another unless he were actually injured by such use"; and all the authorities hold that whether the party is making a reasonable use is a question of fact. This case also is quoted by *Brown, J., Harris v. R. R.,* 153 N. C., 544.

This stream, in the half a mile that it flows between the plaintiff and defendants, has a fall of 219 feet and is capable of generating 2,700 h.p., of which the defendants are entitled to use one-half. The witnesses give many instances in which one-half of the stream is thus utilized by wing dams, some of which are set out in this case, 169 N. C. at pp. 475 and 476. Whether the defendants can utilize one-half of the water by a wing dam is a matter of fact and not of law. *Prentiss v. Geiger,* 74 N. Y., 341; *Bullard v. Mfg. Co.,* 77 N. Y., 525; Gould on Waters, sec. 220; *Dumont v. Kellogg,* 18 Am. Rep. (Mich.), 102; *Hayes v. Waldron,* 84 Am. Dec. (N. H.), 105; *Merryfield v. Worcester,* 14 Am. Rep. (Mass.), 592; *Ullrith v. Water Co.,* 4 L. R. A. (Ala.), 474. And the books are full of similar cases.

What the defendants purpose is not a division of the water, taking it out of the stream, but to utilize the force of gravity contained in the falling of one-half of this water and converting it into electricity for the operation of their street railway and furnishing power and

light to their customers in fulfillment of their contract. This is not a navigable stream, and, therefore, the plaintiff cannot object that this use might diminish the depth of the water on its side—if, indeed, it would have that effect.

While the defendant stressed mostly its evidence that its half of the water could be utilized by a wing dam, it did not abandon its other rights, which have been held in many cases by the best courts. In *Roberts v. R. R.*, 74 N. H., 217, it is said: "The question, therefore, is whether they have the legal right to have the water divided and their share assigned to them in severalty, if this can be done without unreasonably interfering with plaintiff's rights. It is clear that they have such a right if the same rule applies to improved and unimproved water powers, for it is settled that the court has power to make such orders in respect to the way the several owners shall exercise their right in the common property as will be for the best interests of each of them, in so far as it can be done without any unreasonable interference with the rights of the others." In *Warren v. Mfg. Co.*, 26 L. R. A., 288 (86 Me., 32), it is said: "As between opposite riparian owners upon the same channel, the court might have jurisdiction to equalize each owner's use of the water and to mark out beforehand each owner's share, and this by any appropriate proceedings and instrumentality. . . . Opposite riparian owners upon the same channel have a common and equal right to the use of all the water flowing in that channel as it passes their opposite land. If the volume and flow of water be limited, the use by each riparian owner may be limited by judicial action, in proportion so that the enjoyment be kept equal, like the right." To same purport, *Sooville v. Kennedy*, 14 Conn., 349; *Olmstead v. Loomis*, 9 N. Y., 423; *Olney v. Fenner*, 2 R. I., 211; *Lyon v. McLaughlin*, 32 Vt., 423; and *Burnham v. Kempton*, 44 N. H., 78.

The defendants' interest in this stream is either a water power or it is not. If it is a water power, then whether they can utilize it or not is an issue of fact for the jury upon the evidence which they have offered. If it is not a water power, it is not subject to condemnation, for the plaintiff does not seek to condemn it for right of way. If the defendants' interest in this water is not a power power, neither is the plaintiff's interest, and the statute does not authorize it to create a water power by taking the defendants' interest which is not a water power. Besides, if the plaintiff could do this, the defendants could do the same.

The plaintiff occupies a most extraordinary position. It says, in effect, to the defendants: "We will not permit dam or dams across the stream and a division of the water at the middle of the crest whereby you may enjoy your half of the water power. We will not coöperate with you in putting up a plant to generate electric power and divide

the power produced. We will not permit you to put in a wing dam whereby you may utilize only your half of the water without detriment to us. We will not permit you to have a jury to decide upon the evidence whether either of these three methods can be used. We have offered you $1,000 for your half interest in this stream and you have offered us $40,000 for our half. We will not accept your offer nor put the property up to the highest bidder. And having thus prevented you. from enjoying your half of this water power, we will cause the court to decree that you cannot utilize it, and, therefore, we will take your property."

It may be possible that some other plaintiff has .thus boldly stated his intention to take the property of another because he has prevented that other from using it. But, if so, such case cannot be found by ordinary research. The plaintiff's attitude reminds us of the fable in Æsop. Irritated at the resistance of the owner, the plaintiff says, in effect, to the defendants: "Anyway, I need your property in my business, and I'll take it."

The defendants further contend that they are entitled to be protected in their rights under the provisions of the Federal Constitution that they shall not be deprived of their property "without due process of law, nor denied, the equal protection of the law," on four grounds:

1. It is not the "law of the land" that property off the line of railway not needed for its construction can be taken to aid in its operation, such as a coal mine, or wood for fuel or for cross-ties, or water power. Such property for such purpose cannot be taken under "due process of law."

2. Neither can public property like that of the defendants, already devoted to the same public purpose, be taken under the right of eminent domain. Lewis Em. Domain, sec. 400. As well might one railroad company condemn the track, or the engines, or the. cars of another. While one road can condemn a right of way across the track of another, it does not take the sole and exclusive use of the track at that point, as the plaintiff seeks in regard to the property of the defendants.

3. Both the State and Federal Constitutions guarantee the right of trial by jury as to disputed issues of fact. Putting the case most strongly for the plaintiff, whether or not the defendants can utilize their half interest in this water power is, upon the evidence, a much disputed issue of fact, and the court could not deprive them of this right under "the law of the land."

4. The public policy of the Federal and State governments, as shown by statutes and by decisions, notably in the judgments dissolving the American Tobacco Company, the Standard Oil Company, the Sugar Trust, the Hartford and New Haven Railroad Combination, and many other cases, is that such combinations are injurious to the

public welfare and "contrary to the law of the land." The Department of Justice is considering instituting similar proceedings to dissolve the great water-power trusts which are taking into their control the most vital sources of heat, power, and light, the water powers of the country. A recent publication made by authority of the United States Government, of which we take judicial notice, shows that in this State already two companies, the Southern Power Company and the Carolina Power and Light Company, own 75 per cent of the water power of this State, and that eight companies control 94 per cent of the total water power of the State, while forty-nine cities and towns altogether control only 1 per cent. If the plaintiff can through the courts wrest from the defendants the enjoyment of their half of this water power which is being used for the town of Hendersonville, then that much will be taken from the 1 per cent of water power which these forty-nine cities utilize to be added to the 94 per cent which has been gathered by the eight corporations which the Government reports, even if some of these eight are not merely *aliases* for the larger ones. It appears that both the president and secretary and treasurer of the plaintiff company are directors in the Northern and Piedmont Railroad Company, which said treasurer in his testimony states is known as "the Dukes' road." It is common knowledge that the Southern Power Company, one of the companies reported by the Government as engrossing the water power of this State, is controlled by the same interests. The defendants have the right, in this proceeding, to have a jury pass upon the question whether the plaintiff company is not potentially the property of the same financial "interests," for, if so, to grant to it the right to absorb this property and take it from the defendants is in violation of the "law of the land" which the Government is seeking to enforce against these great trusts and combinations which would take to themselves the entire water power of the State, the source of light, heat, and power of the future.

For these reasons the defendants invoke the protection of the XIV Amendment at the hands of the courts.

It would seem, therefore, that the property of the defendant is not subject to condemnation, and that the plaintiff cannot, by preventing the defendant from using it, make it subject to condemnation, and that in any aspect the defendants are entitled to a trial by jury, and to deprive them of such right is in violation of both the State and Federal Constitutions.

Joseph B. Lee, "one of the owners and directors of the plaintiff company" (as he styles himself), testified that, as such, he offered the defendants $1,000 for their one-half of this water power, which he "thought was a fair offer." But he admitted, on cross-examination, that he refused to take $40,000 for the plaintiff's half when offered by

the defendants. The uncontradicted testimony is that the defendants had $40,000 in bank to back this offer, though it was admitted that the defendants' capital was small as compared with that of the plaintiff.

The plaintiff's evidence was that it was intended to spend $2,000,000 on the development of this water power. Under the statute a water-power plant cannot condemn another's water power, whether in use or not. This is only allowed to an interurban railroad company, and even then only if the water power sought to be condemned is "not being used, or held to be used, for development by its owner." The sum of $2,000,000 intended to be spent by the plaintiff on this plant is evidence for the jury to consider whether it is seeking *bona fide* to take the defendants' water power merely for an interurban railroad or to create a water power. Indeed, the complaint avers an intention to build a very short railroad and "to sell its surplus power." In the latter event the plaintiff cannot condemn even an unused water power.

The plaintiff says it will not sell its half of this water power, which is only a small part of its holding, for $40,000, but, strangely enough, it insists that it shall be allowed to use the "strong arm" of the law to take *all* the water power of the defendants, being the other half of the stream at this point, for $10,000. Such claim is not founded in justice, without respect to persons, nor consonant to the sentiment of the ages. "Nathan said unto David, There were two men in one city, the one rich and the other poor. The rich man had exceeding many flocks and herds; but the poor man had nothing save one little ewe lamb, which he bought and nourished up; and it grew up with him and with his children; it did eat of his own meat and drank of his own cup and lay in his bosom, and was unto him as a daughter. And there came a traveler unto the rich man and he spared to take of his own herd to dress for the wayfaring man that had come unto him, but took the poor man's lamb and dressed it for the man that was come unto him." 2 Samuel xii, v. 1-4.

We know, too, the story of Naboth's Vineyard, I Kings, ch. xxi. They who have been to Potsdam near Berlin will remember that when Frederick the Great was gathering in the lands to make the famous park for his palace at Potsdam, there was a miller whose little tract was included within the bounds of the park, who refused to sell it at any price. When the great king was advised to take it anyway, though one of the most arbitrary of men, he replied: "Let the miller keep his mill, that it may be known that there is law in Prussia." The rustic mill still stands, kept in repair at public expense, and on it in gold letters there still abides this inscription: "Let the miller keep his mill, that it may be known that there is law in Prussia."

HOKE, J., dissenting: When this case was formerly before the Court it was decided that the question at issue between the parties should be referred to the jury. In a concurring opinion then filed my opinion was stated as follows:

"Our statute, in permitting water powers to be condemned for public use, withdraws from the effect of the law any water power which is being used or held to be used or to be developed for use in connection with or in addition to any power actually being used for public service, etc.

"There is evidence in the record tending to show that defendant is the riparian owner of land on one side of Green River, where there is a considerable fall in the stream, giving promise of a good water power, if properly developed. The officials of the company testified, further, that defendants purchased and now hold this property with a view to aid their power already developed and now being used under a charter for the benefit of the public; that they have great need of such undeveloped power and purpose to utilize the same as contemplated and provided by the statute.

"Whether they can carry their purpose and utilize this power in substantial aid of the power already developed, and without unwarranted interference with the rights of the plaintiffs, who own along the opposite bank, is, in my opinion, a mixed question of law and fact, and, on the record, requires that the issue be submitted to the jury."

On further consideration, I am confirmed in the opinion thus expressed, that the issue should be referred to the jury, and I, therefore, dissent from the present disposition of the appeal.